**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CAROL RIGGINS,

        Plaintiff,

vs.                                                        CASE NO. 3:09-cv-856-J-TEM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

## ORDER AND OPINION

      This matter is before the Court on Plaintiff's complaint (Doc. #1), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). Plaintiff has filed a Memorandum in Opposition to the Commissioner's Decision (Doc. #14). Defendant has filed his memorandum in support of the Commissioner's decision (Doc. #18). Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference, dated March 11, 2010 (Doc. #16). The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number).

      The undersigned has reviewed and given due consideration to the record in its entirety, including the parties' arguments presented in their briefs and the materials provided in the transcript of the underlying proceedings. Upon review of the record, the undersigned found the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the undersigned in making his determinations.

Accordingly, the instant matter has been decided on the written record.  For the reasons set out herein, **the Commissioner's decision is REVERSED and REMANDED**.

## I. Procedural History

On October 21, 2003, Carol L. Riggins filed an application for Social Security Disability Benefits alleging disability due primarily to left foot, low back, shoulder, and wrist pain.  Plaintiff's claim was denied in a decision dated April 4, 2007 after several hearings before Administrative Law Judge James R. Russell (the "ALJ") (Tr. 15-26).  The first hearing, in July 2005 (Tr. 1017-56), was continued pending receipt of recent medical records and a functional capacity evaluation ("FCE") that had been conducted immediately prior to the hearing (Tr. 1048-56).  The second hearing, in February 2006 (Tr. 1057-74), consisted primarily of testimony from Plaintiff and a vocational expert (the "VE") (Tr. 1065-74).  The third and final hearing, in February 2007 (Tr. 1075-1113), was held to obtain testimony from a medical expert, Arthur Lorber, M.D. ("Dr. Lorber"), an orthopedist and pain management specialist (Tr. 1075-1113).

Plaintiff has exhausted her administrative remedies; thus, this matter is properly before the Court for review under 42 U.S.C. § 405(g).

## II. Standard of Review

A plaintiff is entitled to disability benefits under the Social Security Act when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).

For purposes of determining whether a claimant is disabled, the law and regulations governing a claim for disability benefits are identical to those governing a claim for supplemental security income benefits. *Patterson v. Bowen*, 799 F.2d 1455, 1456, n. 1 (11th Cir. 1986). The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. §§ 404.1520(a)(4)(i-v), 416.920(a)(4)(i-v); *Crayton v. Callahan*, 120 F. 3d 1217, 1219 (11th Cir. 1997). Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole,

3

taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so.  While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions.  *Keeton v. Dep't of HHS*, 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).  Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled.  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, Plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments.  *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove they suffer from disabling physical or mental functional limitations.  20 C.F.R. § 404.704.

### III. Background Facts

Plaintiff was 37 years old when the ALJ's decision was issued (Tr. 15, 87).  She has a tenth-grade education, a general educational development ("GED") certificate, and has prior work experience as a balance rod installer and a foreman (Tr. 165, 169, 1021).

In July 2002, Plaintiff's left foot was run over and crushed by a forklift while she was working as a Winn-Dixie foreman.  Subsequent to the accident, Plaintiff's pain was constant, aching, throbbing, numbing, and sharp with associated discoloration, swelling, and the inability to bear weight (*see e.g.*,Tr. 304-597).  By October 10, 2002, Plaintiff continued to suffer from intractable pain (Tr. 637).  Her gait was antalgic, her deep tendon reflexes were 1 out of 4 (decreased at the left ankle joint) and she limped with her left foot inverted (Tr. 637).  With respect to her injured foot, Plaintiff's Worker's Compensation physician, Bao Pham, M.D. ("Dr. Pham"), noted a purple discoloration, atrophic skin changes, a moderately tender dorsal side–anterior lateral side, and a painful response to normal stimuli (Tr. 637-38).  In addition, an October 16, 2002 bone scan showed lesions at the base of the metatarsal, lateral cuneiform, and distal metatarsal heads and was positive for Reflex Sympathetic Dystrophy ("RSD")[1] (Tr. 635; *see also* Tr. 1082).

---

[1]Reflex sympathetic disorder ("RSD"), also known as regional pain syndrome ("RPS") is a chronic pain condition.  The primary symptom of RSD is continuous, intense pain out of proportion to the severity of the injury, which gets worse rather than better over time.  RSD most often affects one of the arms, legs, hands, or feet.  Often the pain spreads to include the entire arm or leg.  Typical features include dramatic changes in the color and temperature of the skin over the affected limb or body part, accompanied by intense burning pain, skin sensitivity, sweating, and swelling.  Since there is no cure for RSD, treatment is aimed at relieving painful symptoms.  Topical analgesics, antidepressants, corticosteroids, and opioids are used to relieve pain.  No single drug or combination of drugs has produced consistent long-lasting improvement in symptoms.  Other treatments may include physical therapy, sympathetic nerve blocks, spinal cord stimulation, and intrathecal drug pumps to deliver opioids and local anesthetic agents *via* the spinal cord.  NATIONAL INSTITUTES OF NEUROLOGICAL DISORDERS AND STROKE, *Complex Regional Pain Syndrome Information Page*, http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/reflex_sympathetic_dystrophy.htm (last visited Sept. 15, 2010).

From approximately October 2002 to November 2004, Dr. Pham treated Plaintiff for her left foot injury and associated RSD (*see* Tr. 291-649, 656-899, 904-23).  During this time, Plaintiff presented to Dr. Pham approximately 265 times and received frequent multiple trigger point injections, peripheral nerve blocks, weekly nerve stimulation, neuromuscular therapy, and acupuncture (Tr. 291-649, 656-899, 904-23, 1064).  In addition, Plaintiff utilized heat and ice packs, engaged in physical therapy, took Lexapro, Celexa, Neurontin, Elavil, Lortab, and wore Duragesic patches in an effort to alleviate her pain (Tr. 291-649, 656-899, 904-23).  Plaintiff, however, continued to suffer from severe intractable pain, discoloration, and swelling in her left foot—and remained on temporary total disability status (Tr. 291-649, 656-899, 904-23).

In February 2003, Dr. Pham reported that Plaintiff had a bluish discoloration and coolness to the touch of her left foot, severe pain on light touch, limited range of motion, hyperesthesia, and allodynia (Tr. 923).[2]  As of August 2004, Plaintiff remained on temporary total disability (*see* Tr. 735).  In an August 8, 2004 "To Whom It May Concern" letter, Dr. Pham stated that, throughout his treatment of Plaintiff, she demonstrated only a moderate response to aggressive pain management modalities (Tr. 903).  Dr. Pham concluded that Plaintiff was unable to stand/walk for two hours total in an eight-hour workday due to her foot pain, and that when seated she would need to elevate her foot to diminish swelling (Tr. 903).  He stated Plaintiff would need an assistive devise to ambulate, and that if she attempted to work she would be absent at least four days per month due to

---

[2]Hyperalgesia is an abnormal or pathological increase in sensitivity and allodynia is a painful response to a normally innocuous stimulus.  THE FREE DICTIONARY BY FARLEX, http://medical-dictionary.thefreedictionary.com (last visited Sept. 15, 2010).

treatment and complications associated with her impairment(s) (Tr. 903).  Dr. Pham noted

that Plaintiff's ability to maintain attention and concentration "is practically non-existent due

to the nature of her chronic RSD" (Tr. 903).  Dr. Pham also noted that Plaintiff was not a

malingerer and was not exaggerating her symptoms (Tr. 903).

On October 29, 2003, Orlando G. Florete, Jr., M.D. ("Dr. Florete") reviewed Plaintiff's

medical records and performed an independent medical evaluation for her Worker's

Compensation carrier (Tr. 650-55).  Dr. Florete noted that, although Plaintiff received

injective therapy, medications, and physical therapy, she nevertheless failed to make

significant progress (Tr. 650-55).  On exam she had positive allodynia and hyperesthesia

primarily on the dorsum of the left foot involving the second through the fourth toes

extending up to and around the left ankle (Tr. 653).  Plaintiff's skin was mottled with

swelling, her left foot was cooler than the right, and there was hypersensitivity of the skin

on the sole of her left foot (Tr. 653).

As a result of this exam, Dr. Florete diagnosed Plaintiff with RSD (Tr. 653).  He

recommended changes in her medications and treatment and further recommended a

discontinuation of trigger-point injections, nerve blocks, and physical therapy, as these

treatment modalities were ineffective and being over-utilized (653-54).  He expressed that

Plaintiff might be a good candidate for an interdisciplinary pain program and needed

occupational and vocational rehabilitation before she could work again (Tr. 654).  Dr.

Florete stated that Plaintiff had not reached maximum medical improvement and did not

appear to be malingering or exaggerating her symptoms (Tr. 654).

On February 22, 2005, Dr. Florete noted that his  2003 recommendations, *supra*, had

not been followed by Plaintiff's treating physician(s) and that Plaintiff continued to be

managed conservatively without any significant improvement (Tr. 939-40).  On exam she had significant mottling and discoloration of the entire left foot, colder temperature, positive allodynia, hyperesthesia, and dysesthesia involving the entire left foot up to the ankle area (Tr. 941).  Dr. Florete concluded that Plaintiff was "temporarily totally disabled" (Tr. 941).

In January 2005, an independent medical examination ("IME") was conducted by Anthony F. Kirkpatrick, M.D. ("Dr. Kirkpatrick") on behalf of Plaintiff's Worker's Compensation carrier (Tr. 943-45).  Dr. Kirkpatrick concurred with the diagnosis of RSD, but indicated that the treatment Plaintiff was receiving from Dr. Pham (*i.e.,* multiple trigger point injections and acupuncture) was contraindicated and, in fact, may have been making her RSD worse (Tr. 944-45).

In August 2005, Plaintiff received left lumbar sympathetic nerve blocks from Jeffery Caudill, M.D. ("Dr. Caudill"), but later reported that she had not gotten any long-lasting pain relief (Tr. 980-81, 984).  In addition, Plaintiff continued to complain to Dr. Caudill of increasing pain and weakness in her left shoulder (Tr. 1013).   On January 23, 2006, Dr. Caudill noted that in the 14 months that he had been treating Plaintiff, she remained stable; however, she had not made any progress (Tr. 989-91).  Dr. Caudill concluded that Plaintiff could not perform sedentary work on a continual basis (Tr. 992).  Dr. Caudill stated Plaintiff could not sustain more than one hour at a time of sitting or standing but thought she could perform a part-time job which allowed her to have 15 minute breaks at her discretion (Tr. 993, 996).  Dr. Caudill additionally stated Plaintiff should not lift anything over five pounds because she is not stable on her feet (Tr. 993).  Moreover, Dr. Caudill stated Plaintiff's medications cause her to be very tired and experience an altered mental status (Tr. 991).  Specifically, he stated Plaintiff has "a significant decrease in her mental status and attention

8

span especially" (Tr. 996).

Dr. Caudill explained that while there were good days in which Plaintiff could perform sedentary work, there might be two or three days (or even a week) where she would not be able to perform any work activity at all (Tr. 994). Dr. Caudill disagreed with the July 2005 Functional Capacity Evaluation ("FCE"), *supra*, which indicated Plaintiff could perform light work on a continual basis (Tr. 994-95). Dr. Caudill stated that he did not expect Plaintiff's RSD to ever completely subside, and that it was his opinion she could never perform more than part-time work (Tr. 995-96).

At the 2007 hearing, Arthur Lorber, M.D. ("Dr. Lorber") testified that Plaintiff clearly suffers from RSD, but that some of her early treatment may have hurt, rather than helped her (Tr. 1083-84). Dr. Lorber stated that, by the time Dr. Caudill began treating Plaintiff her prognosis had become much worse, and that because of this her disease was much more difficult to treat and was less likely to respond to treatment (Tr. 1084-85). Dr. Lorber testified that he agreed with the conclusions of the July 2005 FCE (which reports Plaintiff can perform light work with occasional standing and walking) but added that she would also have to avoid temperature extremes, humidity, using foot pedals to push or pull, climbing ladders/ropes/scaffolds, and balancing (Tr. 1085-86). He concluded Plaintiff could stand and walk for a total of two hours, but not more than 30 minutes at a time (Tr. 1087). He thought it was a good possibility Plaintiff would have restrictions on her ability to concentrate given the medications she was taking, but that she could probably nevertheless perform simple repetitive tasks (Tr. 1088). He admitted that this conclusion, however, was based on what he believed the general population would be capable of, as opposed to what Plaintiff, as an individual, would be capable of (Tr. 1089).

Dr. Lorber testified that, in his experience, individuals with RSD involving a lower extremity use crutches or a walker, or something to get weight entirely off the affected limb (Tr. 1092). Therefore, since Plaintiff testified that she did not usually use an assisted device, he believed she "lack[ed] the most severe condition of [RSD]" (Tr. 1092).

In his decision, dated April 4, 2007, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset date of May 16, 2003 (Tr. 20). The ALJ found Plaintiff had the severe impairments of reflex sympathetic disorder (RSD) of the left foot, affective disorder, back pain, and carpal tunnel syndrome of the non-dominant hand; however, he found Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment provided for in 20 C.F.R. pt. 404, subpt. P, appx. 1 (the "Listings") (Tr. 20, 22). The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a significant range of sedentary work (Tr.22). The ALJ found Plaintiff can lift/carry 10 pounds frequently and occasionally; can stand/walk 2 hours of an 8-hour day; can sit 6 hours of an 8-hour day, but that she must be afforded a sit/stand option, and cannot work around ropes, ladders, scaffolds, or hazards (Tr. 22).

At Step 4 of the sequential evaluation process, the ALJ found Plaintiff could not perform any of her past relevant work (Tr. 25). At Step 5, however, the ALJ accepted the VE's testimony that, based on Plaintiff's RFC, she would be capable of performing the representative occupations of order clerk-food and beverage; table worker; and surveillance system monitor (Tr. 26,1066-67). *See also* UNITED STATES DEP'T OF LABOR, *Dictionary of Occupational Titles* §§ 209.567-014, 739.687-182, 379.367-010 (4th Ed. 1991) Thus, a finding of not disabled was entered (Tr. 26).

10

**IV. Analysis**

Without addressing all of Plaintiff's arguments, the Court finds the ALJ's decision was not reached in accordance with the Regulations and the law of this circuit, and is, therefore, not supported by substantial evidence.  More particularly, Plaintiff argues ALJ Russell erred by not properly crediting the testimony of her treating physicians (Doc. #14 at 15).   The Court agrees.

The Regulations provide that, generally, more weight should be given to the opinion of a source who has examined a claimant than to the opinion of a non-examining source. 20 C.F.R. § 416.927(d).   The Regulations further instruct ALJs with respect to properly weighing the medical opinions of treating physicians.   The Regulations provide, in pertinent part, as follows:

> Generally, we give more weight to opinions from [a plaintiff's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s)," a treating physician's medical opinion is due to be afforded great weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.   20 C.F.R. § 404.1527(d)(2).   Important to the determination of whether there is a "detailed, longitudinal picture" of a claimant's

11

impairments is the length of the treatment relationship,[3] the frequency of examination, the knowledge of the treating source as shown by the nature and extent of the treatment relationship, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and the specialization of the physician.  20 C.F.R. § 404.1527(d)(2)–(5).

In addition, it is well established in the Eleventh Circuit that, generally, substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is "good cause" to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).  The Eleventh Circuit has concluded "good cause" exists when a treating physician's opinion is: (1) not bolstered by the evidence; (2) contrary to the evidence; or (3) inconsistent with the treating physician's own medical records.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  "Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence," a reviewing court cannot "disturb the ALJ's refusal to give the opinion controlling weight."  *Carson v. Comm'r of Soc. Sec.*, 2008 WL 4962696 at *1 (11th Cir. Nov. 21, 2008).[4]

---

[3]Generally, the longer a treating source has treated a claimant and the more times a claimant has been seen by a treating source, the more weight that should be given to that source's medical opinion.  20 C.F.R. § 404.1527(d)(2)(i).

[4]Unpublished opinions are not considered binding authority; however, they may be cited as persuasive authority pursuant to the Eleventh Circuit Rules.  11th Cir. R. 36-2.

Here, the Court does not find the ALJ established the requisite good cause for discounting the opinions of Plaintiff's treating physicians. To illustrate, all of the medical experts who treated and examined Plaintiff gave the opinion that she was not capable of engaging in competitive work on a sustained basis, *supra*. ALJ Russell's reasons for rejecting these opinions, however, are not well supported.

For instance, the ALJ states Dr. Pham's records "do not suggest that [Plaintiff] is unable to work, only that [Plaintiff] is unable to stay of [sic] her feet for long hours at a time" (Tr. 23). This statement is not supported by the record. As noted above, Dr. Pham's records do in fact suggest that, at a minimum, Plaintiff was unable to work during the time period within which she was treated by Dr. Pham.

More particularly, Plaintiff presented to Dr. Pham approximately 265 times from October 2002 to November 2004 (*see* Tr. 1064). During this time, she received multiple treatment modalities, which were either ineffective or may have actually made Plaintiff's condition worse (*see* Tr. 291-649, 656-899, 904-23, 1064). Regardless, during this time, Plaintiff continued to suffer from severe intractable pain, discoloration, and swelling in her left foot, and she remained on temporary total disability status (Tr. 291-649, 656-899, 904-23). Dr. Pham stated that, throughout his treatment of Plaintiff, she demonstrated only a moderate response to aggressive pain management modalities, and he concluded Plaintiff was unable to stand/walk for two hours total in an eight-hour workday, and that when seated she would need to elevate her foot to diminish swelling (Tr. 903).

Dr. Pham additionally stated that if Plaintiff attempted to work she would be absent at least four days per month due to treatment and complications associated with her impairment(s) (Tr. 903). The Court would note that this statement appears to be supported

by the record as 265 treatment visits over a two-year time period amounts to approximately 11 office visits per month on average.  The VE testified that more than four absences per month would likely preclude all work activity (Tr. 1069-70).  The Court acknowledges that simply attending an office visit may not take an entire day; however, Dr. Pham stated that both her treatment *and* attendant complications associated with her condition would cause Plaintiff to be absent from work at least four times per month (Tr. 903).  Moreover, Dr. Pham stated that Plaintiff's ability to maintain attention and concentration "is practically non-existent due to the nature of her chronic RSD" (Tr. 903).  The VE testified that a marked decrease in attention and concentration would prevent Plaintiff from performing any competitive employment (Tr. 1068-69).  Again, these notations belie the ALJ's statement that Dr. Pham's records only suggest that Plaintiff is unable to stay on her feet for long periods of time (*see* Tr. 23).

The ALJ also appears to use Dr. Florete's opinion evidence to discount the limitations assessed by Dr. Pham (*see* Tr. 23); however, the ALJ's statements with respect to Dr. Florete's assertions are not supported by a close reading of the record.[5]  For instance, the ALJ states that Dr. Florete posited that Plaintiff could perform light work (Tr. 23); however, the Court cannot find in the record where Dr. Florete stated Plaintiff could perform light work. In fact, in a 2004 deposition related to Worker's Compensation, Dr. Florete unequivocally stated that Plaintiff should never perform more than sedentary work (Tr. 139).  Specifically, Dr. Florete testified as follows: "I will not let this patient [Plaintiff]

---

[5]It should be noted that throughout his opinion the ALJ refers to a "Dr. Florente" (Tr. 22-23).  As a Dr. Florente is not mentioned anywhere in the record, it is presumed that the ALJ meant to refer to Dr. Florete.

perform any more than [a] sedentary, desk job" (Tr. 139).

Although Dr. Florete stated he believed Plaintiff should not be *permanently* disabled because she has a genuine desire to work and still has the use of her hands and mind, he specifically qualified this statement by adding that he believed Plaintiff would only be capable of performing competitive work activity if she were to complete some form of vocational or occupational rehabilitation with an interdisciplinary protocol approach that included psychological management, stress management, relaxation training, pharmacotherapy, biofeedback, additional physical therapy, if indicated, and injective nerve block therapy (Tr. 116-17).   Even with respect to his belief that Plaintiff may one day be able to return to work, Dr. Florete maintained that she would nevertheless have to begin working on a part-time basis before progressing, if capable, to full-time employment (Tr. 140-41).   Moreover, as of February 22, 2005, Dr. Florete continued to maintain that Plaintiff was "temporarily totally disabled" (Tr. 941-42).   In sum, the ALJ's statement that Dr. Florete noted Plaintiff was capable of light work is simply not supported by the record evidence.

The ALJ points to a Functional Capacity Evaluation ("FCE") that was conducted on July 8, 2005, which indicates Plaintiff can perform light work with only occasional walking or standing (Tr. 23).   While this evidence indicates Plaintiff could physically perform light work (as of the date of the exam), Dr. Caudill explained that while there were good days in which Plaintiff could perform work activity, there might be two or three days or even a week where she would not be able to perform any work activity (Tr. 994).   Further, Dr. Caudill disagreed with the 2005 FCE that indicated Plaintiff could perform light work on a continual basis (Tr. 994-95).   Dr. Caudill stated that he did not expect Plaintiff's RSD to ever completely subside, and that it was his opinion she could never perform more than part-

15

time work (Tr. 995-96).  In addition, Dr. Caudill stated Plaintiff has "a significant decrease in her mental status and attention span" (Tr. 996).  The FCE does not appear to have assessed Plaintiff's mental capabilities or her attention span (*see* Tr. 974-80).  As noted previously, the VE testified that a marked limitation in attention span and concentration would prevent Plaintiff from performing any competitive employment (Tr. 1068-69).

In an effort to discount Dr. Caudill's opinion evidence, the ALJ stated that Dr. Caudill's January 2006 opinion that Plaintiff cannot maintain employment because of frequent flare-ups is not supported by his treatment notes because his "treatment notes fail to document an excessive number of flare-ups" (Tr. 23).  This statement, likewise, is not supported by the record.  To illustrate: (1) on July 14, 2005, Plaintiff presented to Dr. Caudill because she had a "flare-up of pain in her left foot over the past couple of weeks" (Tr. 985; (2) on December 12, 2005, Plaintiff presented to Dr. Caudill due to a "flare-up" of pain (Tr. 1011); and (3) on January 30, 2006, Plaintiff presented to Dr. Caudill stating that she had been experiencing flare-ups "every 48 hours" (Tr. 1009).

Based on the foregoing, the Court finds the ALJ did not demonstrate the requisite good cause to wholly discount the opinions of Plaintiff's treating physicians, which were supported by the nature of Plaintiff's condition, the objective evidence, and were not inconsistent with other substantial evidence of record.  Although, as the ALJ noted, Plaintiff's condition appears to have improved at some point in 2006 (once she was offered different treatment modalities, other than those utilized by Dr. Pham (*see* Tr. 23, 1003-07)), Plaintiff should have at least been considered for a closed period of disability from her alleged onset date through the point where her condition may have improved.

16

The Court strongly suggest that, on remand, the Appeals Council assign this case to an ALJ other than ALJ Russell, as the record reveals ALJ Russell was likely biased against Plaintiff's treating physicians (*see* Tr. 1053, 1097-98, 1100-01) and, in any event, appeared to badger Plaintiff at the 2007 hearing (*see* Tr. 1105-09).

To illustrate, it clearly appears the ALJ was biased against Plaintiff's treating physicians, Dr. Pham and Dr. Florete.  More particularly, at the 2005 hearing, the ALJ stated, "I can be honest with you [Plaintiff's attorney].  I, I, when I look at Pham's records I just almost **giggle**. . . ." (Tr. 1053) (*emphasis added*).  The Court would note that it reviewed Dr. Pham's records and nothing in those records appears humorous to the Court.  Plaintiff presented to Dr. Pham (a physician recommended to Plaintiff by her Worker's Compensation carrier) with a swollen, discolored foot and intractable pain.  Dr. Pham correctly diagnosed Plaintiff with a very serious medical condition (RSD) and attempted to treat her over a two year period.  No physician of record has ever doubted that Plaintiff suffers from RSD of a chronic nature and that her treatment has been mostly unsuccessful.  Again, the Court does not understand what it is about Dr. Pham's treatment notes that would compel ALJ Russell to "almost giggle" (Tr. 1053; *see also* Tr. 291-649, 656-899, 904-23).

At the 2007 hearing, ALJ Russell stated that he believed, since 265 visits to Dr. Pham "did nothing," Dr. Pham was "rid[ing] it [Worker's Compensation payments] as far as he can ride it" (Tr. 1097).  The ALJ then stated to Plaintiff, "I hope he didn't hurt you" (Tr. 1097).  Next, ALJ Russell stated: "Well, now we have a Judge here [himself], we have a Judge here that says if you are taking a high dose of narcotics it can mean that you are treating a very bad pain syndrome.  In the alternative it could mean that you drove by a

pain clinic with your car windows open and somebody threw in a script" (Tr. 1098).  In what appears to be a statement about Dr. Pham, the ALJ states: "You know, this, this doc [presumably Dr. Pham] says she's [Plaintiff] sedentary.  Says she has to have a sit and stand [option].  Well, **dam him**, I'd already figured that out." (Tr. 1100) (*emphasis added*). Again, presumably referring to Dr. Pham, ALJ Russell states that he (Dr. Pham) has "never met a person who wasn't disabled (Tr. 1101).

In reference to Dr. Florete (who was the first physician to recognize that Plaintiff may not have been receiving the most appropriate treatment modalities), ALJ Russell stated: "I saw him [Dr. Florette] in the hall the other day.  And I quickly got out and got on the other elevator, afraid he [Dr. Florete] would inject me" (Tr. 1102).[6]

As the Eleventh Circuit Court of Appeals noted in *Miles v. Chater*,

The ALJ plays a crucial role in the disability review process.  Not only is he duty-bound to develop a full and fair record, he must carefully weigh the evidence, giving individualized consideration to each claim that comes before him.  Because of the deferential standard of review applied to his decision-making, the ALJ's resolution will usually be the final word on a claimant's entitlement to benefits.  The impartiality of the ALJ is thus integral to the integrity of the system.

84 F.3d 1397, 1401 (11th Cir. 1996); *see also* 20 C.F.R. § 404.940.

Moreover, as the *Miles* court stated regarding remarks made by the ALJ in that case (which were similar to the instant remarks): "Whether these comments were based in personal experience or personal animosity, they have no place in the disability evaluation process." *Miles*, 84 F.3d at 1401.

---

[6]ALJ Russell did, however, add that this particular comment was made in jest (Tr. 1102).

Regarding statements made to Plaintiff during the 2007 hearing, the ALJ told Plaintiff: I'd like to see you get that [sic] narcotics off your back.  And then from that point you can **be like the rest of us**.  You can **walk around with your foot hurting periodically**" (Tr. 1107) (*emphasis added*).

An ALJ may not substitute his "medical opinion" for the medical opinion of a treating physician.  *Jones v. Barnhart*, 318 F.Supp.2d 1102, 1106 n.7 (N.D. Ala. 2004); *see also Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., *concurring*) ("as a hearing officer [an ALJ] may not arbitrarily substitute his own hunch or intuition for the diagnosis [or treatment modality] of a medical professional").  When an ALJ fails to consider a claimant's condition despite evidence in the record of the diagnosis, remand is required.  *Vega v. Comm'r of Soc. Security*, 265 F.3d 1214, 1220 (11th Cir. 2001).

Here, the ALJ states that he just wants Plaintiff to "be like the rest of us" who presumably do not suffer intractable pain.  Moreover, ALJ Russell states that if Plaintiff could just somehow be like the rest of us, her foot would only hurt periodically (Tr. 1107).  These are snide remarks that the Court finds have no place in the disability evaluation process.  Furthermore,  as noted previously, opioids are used to relieve pain in cases of RSD, *supra*, n. 1.

The Court would note, however, that when a claimant objects to the assignment of a particular ALJ to his or her case, he or she must notify the ALJ at the earliest opportunity. *Id.*  If the ALJ withdraws, the Commissioner will appoint another ALJ to conduct the hearing.  *Id.*  If the ALJ declines to recuse himself, the claimant may seek reconsideration after the hearing by raising the issue before the Appeals Council. *Id.*; *see also* 20 C.F.R.

§ 404.940.[7]

As Plaintiff did not notify the Social Security Administration with respect to her having an objection to ALJ Russell hearing her case, the Court does not find his demonstrable bias to be a sole basis for remand in this instance.  Nevertheless, as the ALJ's decision is not supported by substantial evidence, his decision shall be reversed and remanded.  Again, the Court strongly suggests that the case be assigned to a different ALJ.

### V. Conclusion

For the foregoing reasons, the Court finds the decision of the Commissioner is neither supported by substantial evidence, nor decided according to proper legal standards. Accordingly, the Commissioner's decision is hereby **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g).

Upon remand, the Commissioner shall re-evaluate Plaintiff in accordance with the applicable Regulations and prevailing case law.  The additional proceedings, should include, but are not limited to: assessment of the severity of all of Plaintiff's medically determinable impairments and, in light thereof, re-assessment of Plaintiff's RFC; consideration of the opinions of Plaintiff's examining and treating medical sources; consideration of the opinions of non-examining medical sources; re-evaluation of Plaintiff's subjective complaints of pain; and, if warranted, additional vocational expert testimony.

---

[7]In this instance, Plaintiff did not ask ALJ Russell to recuse himself, nor did she raise judicial bias as an issue on appeal before the Appeals Council (*see* Tr. 1015-17).  If a claimant objects to an administrative law judge, he or she must notify the ALJ at the "earliest opportunity."   20 C.F.R. § 404.940.

Furthermore, the ALJ shall accord proper weight to the testimony and statements of Plaintiff's treating physicians in accordance with the law of this circuit. *Sharfarz v. Bowen*, 825 F.2d 278, 279-81 (11th Cir. 1987). If the ALJ finds reason to disregard the opinion of a treating or examining physician, he must provide specific reasons for doing so, and these reasons must be supported by substantial evidence in the record. In addition, the ALJ shall consider Plaintiff for, at the very least, a closed period of disability from her alleged onset date to the point at which the Commissioner would assert that Plaintiff became capable of engaging in substantial gainful activity.

## VI. Directions as to Judgment

The Clerk of Court is directed to enter judgment consistent with this Order and Opinion and to, thereafter, close the file. The judgment shall state that if Plaintiff were to ultimately prevail in this case upon remand to the Social Security Administration, any motion for attorney fees under 42 U.S.C. § 406(b) must be filled **within fourteen (14) days of the Commissioner's final decision to award benefits**. *See Bergen v. Comm'r of Soc. Sec.*, 454 F.3d 1273, 1278 n. 2 (11th Cir. 2006) (recognizing that the fourteen (14) day filing period for a claim for attorney's fees, provided for in Rule 54 of the Federal Rules of Civil Procedure, may be an unworkable time-line in these types of cases); *compare* Fed. R. Civ. P. 54(d)(2)(B); M.D. Fla. Loc. R. 4.18(a) (providing that any motion for attorney's fees must be filed no later than fourteen (14) days after entry of judgment).

**DONE AND ORDERED** at Jacksonville, Florida this 22nd day of September, 2010.

Copies to all counsel of record

*Thomas E. Morris*

**THOMAS E. MORRIS**
United States Magistrate Judge